[L. A. No. 19424. In Bank. Nov. 27, 1945.]

DAVIED ELLA RICE, Appellant, v. THE CALIFORNIA LUTHERAN HOSPITAL (a Corporation) et al., Defendants; LUTHERAN HOSPITAL SOCIETY OF SOUTHERN CALIFORNIA (a Corporation), Respondent.

Sullivan & Lane, Robert J. Sullivan, William J. D. Lane and George Stahlman for Appellant.

Musick, Burrell & Pinney, Howard Burrell, Anson B. Jackson, Jr., Albert Mosher and Clayton Straub for Respondent.

CARTER, J.—Plaintiff appeals from a judgment for defendant, Lutheran Hospital Society of Southern California, a corporation, notwithstanding a verdict in her favor, in an action for personal injuries alleged to have resulted from the negligence of said defendant.

Plaintiff, on the recommendation of her physician, entered the defendant's hospital as a patient at 7:30 p. m. on Thursday, October 8, 1942, for an operation consisting of the removal of her uterus which was affected with cancer. She was assigned to a room and put to bed, where she remained until the following Saturday morning when the operation was performed. The operation required an abdominal incision four or five inches long, and extended over a period of an hour and forty-five minutes. A spinal anesthetic was administered prior to the operation, and occasionally during the progress of it, nitrous oxide (laughing gas) was given to the patient.

At the time of the injury plaintiff's room was equipped with a table standing about a foot from the left side of the bed, the top of which was about six inches below the level of the bed. On the Monday following the operation at 12:30 p. m., while plaintiff was alone in her room, an employee of the hospital brought a tray with a teapot of hot water, a cup and saucer, a spoon and a tea bag which she placed on the bedside table. She left immediately. Later a nurse noticed that the call light at plaintiff's door was on and entered her room. She found the teapot and cup and saucer on the bed. The tray was on the bedside table. Plaintiff had suffered burns

on her arm and breast. The nurse had been instructed in the morning by the doctor to serve plaintiff hot tea.

To support the judgment notwithstanding the verdict defendant urges that there was no substantial evidence of negligence; that plaintiff was, as a matter of law, contributively negligent and assumed the risk; that even if serving the tea constituted negligence, plaintiff's physician alone was liable, as defendant hospital was merely following his instructions.

█ This court has recently stated the standard of conduct required of a hospital in the care of its patients:

" 'The extent and character of the care that a hospital owes its patients depends on the circumstances of each particular case. A private hospital owes its patients the duty of protection, and must exercise such reasonable care toward a patient as his known condition may require. The measure of duty of a hospital is to exercise that degree of care, skill and diligence used by hospitals generally in that community, and required by the express or implied contract of the undertaking. A hospital is liable for want of ordinary care, whether from incompetency of a nurse or failure in duty by a fully qualified nurse. . . . The duty of care imposed on a hospital extends to safeguarding the patient from dangers due to mental incapacity. . . . On the other hand, a private hospital is not an insurer of a patient's safety, and the rules as to care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen.' " (*Wood* v. *Samaritan Institution*, 26 Cal.2d 847, 851 [161 P.2d 556].)

█ In the light of that standard there is sufficient evidence from which the jury could find negligence on the part of defendant in this case. Plaintiff was about 60 years of age. The operation was a serious one requiring nearly two hours to perform and severely taxing the strength of the patient. Only about 48 hours transpired between the operation and the injury. A drainage tube was maintained in the wound until Monday morning. A tube through the nose of the patient to her stomach was maintained to alleviate nausea. The patient was nauseated and frequently vomited. She had had no oral nourishment. She was suffering pain, and drugs were administered to her, the last before the occurrence of the injury being at about 10 a. m. Monday and consisting of 1/3 grain of pantopon, a derivative of opium. About 2:50 Monday

morning she had been given 1/6 grain of morphine. Dr. Chaffin, the surgeon on the case, testified: "Q. Is it not a fact, Doctor, that in some instances it (morphine) produces drowsiness? A. It *usually* does produce some degree of drowsiness, more in some than in others. . . . Q. I will ask you to state whether from your observation you formed an opinion as to about how long there would be any effect from the administration of a dose of 1/6 grain of morphine in Mrs. Rice's case. A. We consider the morphine pretty well eliminated in about four hours from the system." (Emphasis added.) And "Q. What would be the comparative strength, if that is the proper term, of 1/3 grain pantopon and 1/6 grain of morphine? A. It is about the same. Q. That (pantopon) was administered at what hour? A. 10:10. Q. 10:10 on Monday morning? A. That is right." Plaintiff remained in a reclining position. Her condition was, as expressed by her: "I was feeling terrible; I was weak after the operation; I was lifeless, I could not move this way, I could not move that way, there was tubes here and tubes . . .," and on Monday morning she said her "mind was very weak." She described the occurrence of the injury as follows: "I was asleep sometime after 12:00 o'clock, and my bed in my room faced this way, and over here against the wall is a dresser in front of the bed, was a dresser, down at the other end of the room, and as I woke up I saw a form there. . . . I saw this form standing there looking into the mirror, as she turned around she said something to me, what she said I don't know, and she walked out of the room. Q. Did you make any reply? A. No, not that I know of. Then in a few minutes I have no recollection what happened at all, I felt a terrific heat on me, I looked down, there was this hot water all over the side here, all under the arm here, and I screamed, and then two or three nurses came in, and they saw it was burned and then they put . . . the head nurse of the floor, she put salve on it, some kind of salve on the arm here, under here, under here, bandaged it all up." No drinking tube was furnished with the hot water and tea. The employee serving it placed it on the bedside table and immediately left the room leaving plaintiff unattended. She did not advise plaintiff that the water was hot, although she testified that she told plaintiff that she should have a nurse help her with the tea.

From all of these circumstances the trier of fact was justified in finding that the standard of care required by defendant

had not been met; that defendant either knew or should have known of plaintiff's condition; that it would be dangerous to leave the hot water and tea on the bedside table without any facility for drinking it, such as a tube, and without any safeguards or attendants; and that a hazard had been created that would probably result in an injury to plaintiff.

Defendant vigorously asserts that the only credible evidence in the case shows no liability on its part. It points to testimony of doctors, nurses and the hospital charts to the effect that plaintiff's condition was good a short time prior to the accident on the day thereof; that she was exceptionally alert mentally; that the narcotics administered to her were for pain alone and would not cause drowsiness or mental sluggishness; and that several witnesses testified that plaintiff had told them that the accident was her fault in that she tired to help herself to the tea to avoid bothering the nurses. It suggests that the evidence produced by plaintiff's own witnesses shows her condition to have been good, that the narcotics did not affect her mental clarity, and in that connection she is bound by the testimony of those witnesses.

Contrary to that latter contention, however, it is within the province of the trier of fact to resolve conflicts in evidence whether the conflict is between witnesses on one side or on opposite sides. Hence, this court will not disturb the finding where there is any substantial evidence supporting it, even though there is a conflict in the evidence produced by the prevailing party. (See *Dietlin* v. *General American Life Ins. Co.,* 4 Cal.2d 336 [49 P.2d 590]; *Frazee* v. *Fox Film Corp.,* 45 Cal.App. 661 [188 P. 286]; *Parker* v. *Herndon,* 19 Cal. App. 451 [126 P. 183]; *Pedrow* v. *Federoff,* 77 Cal.App. 164 [247 P. 212]; *Brock* v. *Pearson,* 87 Cal. 581 [25 P. 963]; *Weintraub* v. *Soronow,* 115 Cal.App. 145 [1 P.2d 28]; *Isham* v. *Trimble,* 5 Cal.App.2d 648 [43 P.2d 581]; *Gackstetter* v. *Market Street Ry. Co.,* 10 Cal.App.2d 713 [52 P.2d 998]; *Bushey* v. *Union Oil Co.,* 13 Cal.App.2d 350 [56 P.2d 1272]; *People* v. *Crownover,* 34 Cal.App.2d 7 [92 P.2d 929]; *Rosella* v. *Paxinos,* 110 Cal.App. 299 [294 P. 39].) It may be conceded that the conflict in the evidence in this case is violent. Nevertheless, the credibility of the witnesses and the resolution of those conflicts was for the jury. We cannot say that plaintiff's testimony was inherently incredible, especially when we consider the background of her age, the seriousness of the operation, the time elapsing between the operation

and the injury, and the narcotics administered, together with evidence that they usually made a patient drowsy and lasted for about four hours. Defendant attacks plaintiff's testimony that she was unconscious or asleep all the time, as being particularly incredible, and points to other testimony on her part in which she recites events that occurred. However, the jury could have concluded that her statement relating to her condition of unconsciousness was not meant literally and that she was aware of some things. It could reasonably have decided that she was in a mental condition that was far from alert—that her comprehension, awareness and ability to function were subnormal. Plaintiff denied the asserted admissions that the injury was due to her own carelessness. If her condition was as described by her, and the jury was justified in concluding it was, especially in light of the surrounding circumstances, then the jury was authorized to conclude that the hospital should have been aware of that condition inasmuch as it assumed the duty of proper care of its patients and of taking appropriate precautions. It is not vital that there was no evidence that plaintiff threw her arms or tossed about in delirium and thus brushed the hot water from the stand onto the bed. Nor is the fact that the top of the bedside stand was below the level of the bed of controlling significance. In her weakened physical condition and confused state of mind, which the jury could decide existed, it was not at all improbable that she would in one manner or another spill the hot water on herself. She may have assumed, as a person of ordinary prudence, in a half conscious fashion, that it was safe to attempt to consume the tea, not realizing the danger incident thereto or the extent of her weakness. According to defendant's evidence she had had no oral nourishment except tea on Sunday. The jury could have inferred that she would have a craving for the tea, and would, in view of the circumstances, underestimate her strength and ability to handle the hot water. ■ Defendant on the other hand was under a duty to observe and know the condition of a patient. Its business is caring for ill persons, and its conduct must be in accordance with that of a person of ordinary prudence under the circumstances, a vital part of those circumstances being the illness of the patient and incidents thereof.

■ The foregoing discussion not only shows a basis for finding defendant negligent because it should have anticipated the hazard inherent in its omissions, but also establishes that

plaintiff was not contributively negligent as a matter of law. Her conduct must be measured by the standard of a person of ordinary prudence under the circumstances. Her physical and mental condition are a part of those circumstances, and in determining what a person of ordinary prudence would do under the same circumstances, it is necessary to visualize a person in a similar condition when ascertaining what acts or omissions would be negligent and what would not be. We cannot say that the only reasonable hypothesis is negligence on her part or that reasonable and sensible men could have reached no other conclusion. (See *Anthony* v. *Hobbie,* 25 Cal.2d 814 [155 P.2d 826].)

Defendant argues that if anyone is liable it is Dr. Chaffin, plaintiff's physician, who gave the order that plaintiff be served tea knowing the customary manner of serving it which was followed in the case at bar. If the duty of care resting upon the hospital embraced the serving of the tea, defendant cannot escape the responsibility for performance of that duty by attempting to shift it to the doctor. The doctor merely fixed the time when tea could be served to the patient, he did not purport to supervise the care and supervision to be exercised in the process of serving it. Even if he ordered the tea to be served in the customary manner, but that manner was negligent, the defendant would be liable in following such instruction where a duty of care toward the patient rested upon it. The obligation and duty assumed by the hospital is stated generally in *Guilliams* v. *Hollywood Hospital,* 18 Cal.2d 97, 103 [114 P.2d 1] :

''The complaint charges only what is common practice, that the hospital agreed to care for the patient in the usual manner, that is, to furnish him with accommodations and to maintain such attendants, including nurses and internes, as would assure him proper care and attention before, during and after the operation. Under such circumstances it cannot be said that the hospital is practicing medicine in violation of law.'' The nurses attending plaintiff were employed by the defendant hospital and were not special nurses in the employ of either plaintiff or her physician. Likewise, the person who served the tea was defendant's employee. The defendant was bound to supply proper attendance and care to plaintiff and that duty extended to furnishing and supervising the furnishing of nourishment. It cannot be said that because the doctor ordered tea to be served plain-

tiff, he was making the nurses and the server of the tea his servants and employees to the exclusion of defendant hospital as the employer. The hospital still had direction and control over its employees and was responsible for the care to be observed by them in the process. Defendant relies upon such cases as *Steinert* v. *Brunswick Home, Inc.,* 172 Misc. 787 [16 N.Y.S.2d 83] ; *Schloendorff* v. *Society of New York Hospital,* 211 N.Y. 125 [105 N.E. 92, Ann.Cas. 1915C 581, 52 L.R.A. N.S. 505] ; and *Mesedahl* v. *St. Luke's Hospital,* 194 Minn. 198 [259 N.W. 819]. Reference may also be made to *Ware* v. *Culp,* 24 Cal.App.2d 22 [74 P.2d 283]. In the Ware case, a special nurse employed by the patient, not an employee of the hospital, was involved. In the Steinert case the nurse, an employee of the hospital, was assisting the operating surgeon, not an employee of the hospital, and was under his direct control and supervision when the nurse acted negligently. Assuming but not deciding the correctness of the general rule stated in that case, that is, that a hospital is not liable for the negligence of a nurse employed by it when acting under the direction of a physician not employed by it, in matters relating to medical care and treatment of a patient while confined in such hospital, such a case is not here presented. It may be that the giving of the order that tea be served was a part of the medical treatment, but the serving thereof and the care and attention in connection therewith certainly were part of the duties assumed by the hospital and were not a part of the medical treatment. The Mesedahl case must be said to go further than the Steinert case.

It should be noted that a nurse or physician may be the servant of a hospital, thus requiring the application of the doctrine of *respondeat superior* even though they are performing professional acts. (See *Brown* v. *La Societe Francaise,* 138 Cal. 475 [71 P. 516] ; *Inderbitzen* v. *Lane Hospital,* 124 Cal.App. 462, 466 [12 P.2d 744, 13 P.2d 905] ; *Bowman* v. *Southern Pac. Co.,* 55 Cal.App. 734 [204 P. 403].)

The judgment is reversed and the trial court is directed to enter judgment for plaintiff on the verdict.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied December 20, 1945.