MARIN M. VALENTIN, Appellant, v. LA SOCIETE FRAN-
CAISE DE BIENFAISANCE MUTUELLE DE LOS
ANGELES (a Corporation), Respondent.

Frank J. Barry for Appellant.

Gibson, Dunn & Crutcher and Philip C. Sterry for Respondent.

MOORE, P. J.—Plaintiff's son, August, underwent a successful operation for hernia August 19, 1940, in defendant's privately owned hospital in Los Angeles. His condition remained normal for eight days after which for three days he exhibited distressing symptoms of a disease which turned out to be tetanus. After a definite diagnosis he was moved to the county hospital September 1, at 12:15 a. m. for antitetanic treatments and expired at 9:10 p. m.

Basing his action upon the wrongful death of his son, appellant demanded damages. At the conclusion of the trial defendant's motion for an instructed verdict was denied. After a verdict had been returned in appellant's favor for $10,000 defendant's motion for judgment notwithstanding the verdict was granted on the ground that there was no evidence proving or tending to prove negligence proximately causing the death. Following a denial of his motion for a new trial plaintiff appealed.* The question for decision is whether

---

*The action was at first brought also against Doctors Lopizich, Hull, and Hawkins as physicians and surgeons employed by defendant to render medical and surgical services to the patients of defendant. At the first trial, January, 1943, the action was dismissed by plaintiff as to the first two physicians and a verdict was returned in favor of Doctor Hawkins by direction of the court. After judgment against the hospital based on a verdict the court granted a new trial. The verdict on the second trial was returned March 27, 1945. The judgment appealed from was entered April 13, 1945.

the court committed prejudicial error in granting defendant's motion.

### THE COURT EXCEEDED ITS POWER

■ The trial court's power to grant a judgment notwithstanding a verdict has been repeatedly defined. It is only after it has disregarded contrary evidence, accorded to the prevailing evidence and all of its legitimate implications the full value to which they are entitled and has found no substantial evidence in support of the verdict that the court should enter a contrary judgment. (*Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190]; *Estate of Green,* 25 Cal.2d 535, 546 [154 P.2d 692]; *Blake* v. *Hearst Publications Incorporated,* 75 Cal.App.2d 6, 8 [170 P.2d 100].) ■ If at the time the case was submitted to the jury there was any substantial evidence in the record to prove that defendant was negligent in its treatment or in its care of decedent and that such negligence was the proximate cause of the death, the court erroneously granted the motion.

### SUBSTANTIAL EVIDENCE

■ Defendant was bound by express contract to furnish decedent with the services of competent, learned, skillful physicians and surgeons and with the care of trained nurses. It is the duty of any hospital that undertakes the treatment of an ill or wounded person to use reasonable care and diligence not only in operating upon and treating but also in safeguarding him, and such care and diligence is measured by the capacity of the patient to care for himself. (*Robertson* v. *Charles B. Towns Hospital,* 178 App.Div. 285 [165 N.Y.S. 17].) It has been held negligence (1) for a surgeon to fail to discover a hemorrhage which he had caused or for him to refuse to suture the operative wound (*Gilstrap* v. *Osteopathic Sanitorium Co.,* 224 Mo.App. 798 [24 S.W.2d 249]); (2) for nurses to allow a patient to be burned by an electric heating pad (*Hamilton* v. *Corvallis General Hospital Assn.,* 146 Ore. 168 [30 P.2d 9]); (3) for the management of a hospital to allow the continued use of a lamp after the insulation on its key used for turning on the light had broken off, exposing the metal (*Baker* v. *Board of Trustees of Stanford,* 133 Cal.App. 243 [23 P.2d 1071]); (4) for a sanitarium in caring for alcoholics to leave a window unguarded through which a delirious patient might plunge (*Robertson* v. *Charles B. Towns Hospital, supra*). ■ Whether the hospital or

its nurse should have foreseen the casualty and have protected the patient by timely warning of a known danger are questions ordinarily for the jury. (30 C.J. 470, paragraph 31; *Welsh* v. *Mercy Hospital,* 65 Cal.App.2d 473, 480 [151 P.2d 17].)

If a hospital is obliged to maintain its premises and its instrumentalities for the comfort of its patients with such care and diligence as will reasonably assure their safety, it should be equally bound to observe the progress of a patient in his recovery from a major operation with such care and diligence as his condition reasonably requires for his comfort and safety and promptly to employ such agencies as may reasonably appear necessary for the patient's safety.

Whether a hospital has exercised such reasonable care under the circumstances of a case is for the determination of the jury. (*Ward* v. *St. Vincents Hospital,* 39 App.Div. 624 [57 N.Y.S. 784] ; *Robertson* v. *Charles B. Towns Hospital, supra; Hamilton* v. *Corvallis General Hospital Assn., supra.*) It follows that if the record shows substantial evidence of defendant's negligence and that such negligence was the proximate cause of decedent's death the judgment must be reversed.

Malpractice is the neglect of a physician or a nurse to apply that degree of skill and learning in treating a patient which is customarily applied in treating and caring for the sick or wounded similarly suffering in the same community. (See Webster's International, Oxford and Bouvier's dictionaries; C.J., Am.Jur.). While proof of it is customarily made by the testimony of experts (*Rasmussen* v. *Shickle,* 4 Cal.App.2d 426, 430 [41 P.2d 184] ; *Perkins* v. *Trueblood,* 180 Cal. 437, 443 [181 P. 642]), and while the law makes allowances for human weakness in the application of skill and learning (*Rice* v. *California Lutheran Hospital,* 27 Cal.2d 296 [163 P.2d 860, 862]), the facts of each case must be judged according to their own merits. If the alleged neglect relates to matters or conduct which are reasonably within the ken of the average layman the jury may determine the culpability of the person charged therewith without the aid of experts. If it relates solely to the exercise of judgment in the application of skill and learning then proof of the negligence must be made by experts. Viewing the facts of this case from either angle it is inescapable that in the treatment and nursing of decedent by defendant there is substantial

evidence that the servants of defendant were negligent in failing to exercise ordinary care in two respects, namely: (1) in the application of the skill, learning and diligence reasonably required in a private hospital in Los Angeles in 1940, and (2) in refusing to take steps for the protection of decedent or to act when evidence of the presence of a pathological condition and of a progressive deterioration was brought to their attention. ■ A private hospital is required to give its patients the character of treatment customarily administered for the same disease or symptoms by similar hospitals in the same locality and at the time in question. It must exercise such reasonable care in treating a patient as his known condition may require. (*Rice* v. *California Lutheran Hospital*, 27 Cal.2d 296 [163 P.2d 860, 862].)

### PLAINTIFF'S EVIDENCE WAS SUBSTANTIAL

The complaint alleged (1) that the tetanus infection resulted from negligence in the operation or from the subsequent negligent care of the patient, or (2) in failing to discover its presence or to prevent its development following a definite diagnosis. Inasmuch as the record discloses positive evidential support of the second allegation, a discussion of the claim of negligence in the operation will be omitted.

■ On entering the hospital August Valentin was 20 years of age. He was in good health except for the hernia. Following the operation on August 19 his condition was normal until August 27 when his temperature of 101 degrees and a pleuritic pain in his right side were diagnosed as broncho-pneumonia. On the 28th and 29th his fever registered 102.6 degrees and he was flushed and dyspnoeic. On the 30th at 5 p. m. Mrs. Broguiere, whose son occupied the same room where she had called frequently, observed that August was not reading and was less talkative than usual. Although his temperature showed a decline on Saturday the 31st, he complained of soreness in his chest and of his inability to chew. At noon, on request of the bedside nurse that he be examined, Doctor Hawkins, the resident physician, found him suffering a tight feeling in his throat and pain on attempting to open his mouth. Doctor Hawkins reported to the supervisor of nurses that it looked to him "like this might be a case of tetanus" and instructed her to call the attending physician. He then left for the day. As to the operating surgeons, Doctor Lopizich was on vacation; Doctor

Hull did not arrive before 11 p. m., after a diagnosis of tetanus had been made definite by Doctor Bennett and the boy faced eternal sleep.

The nurse's chart for that Saturday afternoon showed a progressive deterioration; pain and stiffness in the neck, tightness in the chest, difficulty in opening the mouth and in swallowing; poor appetite, much expectoration, drowsy. At 7:30 p. m. Mrs. Valentin arrived and was alarmed to find the marked change in her son for the worse. She reported her observations to the head nurse, expressed her extreme anxiety and demanded that some physician be called at once. During more than three hours she continued her remonstrances in vain. She reminded the night supervisor of nurses that there were many doctors and insisted that one be called. Just after her departure at 10:30 p. m. Doctor Bennett, on leaving a patient upon whom he had called, at the request of the night supervisor examined young Valentin, announced him to be suffering from tetanus and advised that he be at once transferred to the county hospital. After his arrival there at 1:50 o'clock Sunday morning antitetanic treatments were vainly administered throughout the day.

In the light of the foregoing rules governing the proof of malpractice and the responsibilities of private hospitals the proof of defendant's negligence and that it was the proximate cause of the death of August Valentin is substantial. It is established by evidence of the inaction of the nurses in the presence of signals of danger which would have moved a reasonably intelligent attendant promptly to import a competent physician for the purpose of taking necessary precautions to prevent the development of the disease. For a supervisory nurse to permit a patient recovering from a major operation to suffer symptoms indicating a growing pathology for three days without medical care merely because the attending physicians were not available is a type of conduct that is negligence.

In addition to the appeal to the lay mind by the occurrences detailed by the witnesses, the testimony of Doctor Webb fills all of the essential requirements for an expert to prove malpractice of the hospital. Doctor Webb had been chief autopsy surgeon of Los Angeles County for many years, and served for 14 years as assistant to his predecessor. Following his graduation from Columbia College of Physicians and Surgeons in 1902 he served in a government hospital in

the District of Columbia and in New York City in the treatment of pathological diseases until 1912. He then served a Canadian railroad in the treatment of personal injuries, which required a knowledge of tetanus, of its symptoms and mode of treatment. After locating in Los Angeles in 1915 he taught in a local university until 1923. During the latter five years of that period he was instructor in histology and pathology which "pertained directly to tetanus," its diagnosis, prevention and treatment. Having been licensed to practice while teaching he became an assistant autopsy surgeon in 1923 and took the post of autopsy surgeon in 1937. He had read many clinical reports on tetanus cases with special attention to the advantage gained over the disease by early treatment. He had kept informed as to the methods of treating tetanus patients by conferring with attending physicians and hospital authorities prior to August, 1940, and was thereby made familiar with the methods in vogue in Los Angeles in August, 1940, having performed post mortem examinations in many cases which had come from prominent, private, well-managed hospitals of Los Angeles. Also, he was familiar with the literature on the care of tetanus and with hospital histories of cases and had learned of the procedure and usage of such hospitals from such histories. Furthermore, he was familiar with the reports of the county hospital on 100 cases of tetanus treated in that institution and knew that the antitetanic serum is "the only recognized remedy for cure."

Upon his qualifications as shown by his testimony the court below allowed the doctor to testify that tetanus is curable; that medical science has a specific cure which when promptly applied is effective in the great majority of cases; that such remedy was commonly known and available and was usually applied by physicians and surgeons in the practice of their profession in and around Los Angeles in the summer of 1940; that it is imperative that such antitetanic treatment be administered promptly upon the appearance of the symptoms of tetanus and that if so applied 80 per cent of those afflicted will probably recover. His testimony was supported by the record kept by the Los Angeles County Hospital during 1940 and 1941 of 100 consecutive cases of tetanus treated there. Such record concludes with the declaration that the application of the same cure in an identical manner resulted in the reduction of the gross mortality rate of 56.5 per cent in past years to a current rate of 29 per cent, and that if the patients

who had succumbed during the first 24 hours of hospitalization be excluded from the calculation the series presents a net mortality rate of but 19.3 per cent among 88 patients.

Upon such proof the jury were warranted in finding that with a specific and efficacious cure available its merits were necessarily known to the resident physician and to the supervising nurses of defendant, and that they were negligent (1) in not making it available promptly to decedent when Doctor Hawkins declared that the disease might be tetanus, (2) in not employing other physicians as soon as decedent's symptoms indicated a constant deterioration, and (3) in not proceeding as diligently with the care of him as the prevailing usage, procedure and practice of well ordered hospitals in Los Angeles in 1940 required under such circumstances. On the occurrence of such changes ordinary care would have impelled the nurse in charge to call another physician if the attending physicians were not available. While the symptoms manifested by decedent were in themselves sufficient to stimulate a nurse of ordinary prudence to energetic actions, those in attendance had the additional alarms sounded by Mrs. Broguiere on Friday and by Mrs. Valentin on Saturday evening that August was desperately ill. But not an effort was made to procure another physician until 10:40 p.m. Saturday, when by chance the diagnosis of Doctor Bennett was announced. Whether such behavior of nurses who had knowledge of the progressive deterioration of decedent constituted negligence was properly a question for the jury.

Objections were made to much of the evidence prior to its admission but none of it was ever stricken. It accompanied the jury to their deliberations and upon it the verdict in favor of plaintiff was returned. From it they could and evidently did find that had defendant caused an examination by a physician on Friday at 5 p.m. when decedent displayed the first symptoms of tetanus the virus would then have been found and the patient might have had 49 hours of antitetanic treatments before 9 p.m. on Sunday instead of only 19. They could and evidently did find that had defendant effected an intelligent examination of decedent at noon on Saturday, when it appeared to Doctor Hawkins like a case of tetanus, the boy would then have had 31 hours of expert care and antitetanic treatments instead of only 19 hours before 9 p.m. Sunday. Finally, the jury could find, as indeed they must

have found from the records of the county hospital, that decedent was in a dying condition during his 19 hours there.

It follows that the jury had substantial evidence from which it could determine that the delay in causing the appropriate medical treatment to be given decedent was the proximate cause of his death.

The order granting the judgment notwithstanding the verdict is reversed and the court below is instructed to enter a judgment in favor of plaintiff in accordance with the verdict.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied September 24, 1946, and respondent's petition for a hearing by the Supreme Court was denied October 31, 1946.

[Crim. No. 4020.   Second Dist., Div. Two.   Sept. 6, 1946.]