[Civ. No. 15846. Second Dist., Div. Two. July 15, 1947.]

MELVIN G. THOMAS, Appellant, v. SEASIDE MEMORIAL HOSPITAL OF LONG BEACH (a Corporation), Respondent.

Frank C. Weller and Thomas S. Tobin for Appellant.

Spray, Davis & Gould for Respondent.

WILSON, J.—Charging negligence on the part of respondent which resulted in the death of his eight-month-old baby appellant brought this action for damages. At the conclusion of his evidence a motion for nonsuit was granted. This appeal is from the judgment of nonsuit.

The complaint alleges that appellant and his wife caused their baby to be placed in the hospital operated by respondent for a minor surgical operation—the removal of a tumorous birthmark known as haemonglioma on the child's shoulder; the birthmark was successfully removed by the operating surgeon; at the time of performing the operation ether was administered to the child which rendered her unconscious; after her removal from the operating room she was placed in a room in which there were four or five other patients; the mother was not permitted to remain in the room while the child was unconscious; during her absence the nurses employed in the hospital negligently failed to give proper attention to the child and permitted her "to smother from a collapse of her lungs while unconscious"; the mother upon returning to the room after an absence of approximately one hour and twenty minutes found the child dead in bed; the nurses who were in charge of the child did not know that she had been dying and were unaware of the fact that she was dead until informed by the mother. It is further alleged that "the death of said minor child was brought about by the negligence of the defendants herein for failure to watch and protect said minor child while unconscious and under the influence of a general anesthetic."

In determining this appeal and in considering whether the court was justified in granting the nonsuit we must consider only the evidence most favorable to appellant's cause of action, together with every reasonable inference to be drawn therefrom and every presumption that can be fairly deemed to arise in support of appellant's allegations. (*Anthony* v. *Hobbie,* 25 Cal.2d 814, 817 [155 P.2d 826] ; *Lashley* v. *Koerber,* 26 Cal.2d 83, 84 [156 P.2d 441] ; *Wood* v. *Samaritan Institution,* 26 Cal.2d 847, 849 [161 P.2d 556] ; *Weck* v. *Los Angeles County Flood Control District, ante,* pp. 182, 190 [181 P.2d 935] and cases cited.)

Considered according to the rules stated and elaborated in the foregoing citations the evidence is as follows: When taken to the hospital the child was placed in a crib by hospital attendants in a room with five other children. She was in the operating room for approximately one hour and was re-

turned to her crib, at which time she was sleeping; she was placed on her abdomen with a small pillow under her and with her head and face slightly lower than her abdomen; she was lying on her right cheek, with her face showing toward her mother; Mrs. Thomas remained at the side of her child for 15 or 20 minutes during which time the baby continued to sleep but was throwing her arms around; Mrs. Thomas covered the child's arms with a blanket several times; there were two other visitors in the room; Mrs. Mitchell, the nurse in charge, came into the room and ordered Mrs. Thomas and the other mothers to leave while the nurses bathed the other children; Mrs. Thomas protested against being compelled to leave her unconscious baby but was told by the nurse that the hospital rules required that she go out of the room while the other children were bathed; when Mrs. Thomas and the other mothers left the room the baby was lying on her abdomen with her pillow under her, and her face on the right side; she was breathing and had stopped throwing her arms around.

Mrs. Thomas later went back to the room and finding the door closed remained in the hall approximately one-half hour. When the door was opened from the inside she stepped into the room and found a nurse's aide with her arms full of soiled clothes and bedding. Mrs. Thomas immediately noticed that her baby was very white; "her face was down into the mattress" and the pillow had been removed; the child's arms were raised parallel with her shoulders; her fingernails were blue, her body was white, and her hands were cold; Mrs. Thomas asked the nurse's aide whether her baby was all right and was told that she was just sleeping from the ether; the nurse's aide started from the room but at Mrs. Thomas's request came back, dropped the bed clothing on the floor, picked up the baby, turned her over on her back and found that she was dead. There were no hospital attendants in the room other than the nurse's aide; the latter called Mrs. Mitchell, the graduate nurse, and two or three doctors who used oxygen and other means of artificial respiration and administered adrenalin but failed to resuscitate the child.

The operating surgeon testified as follows: The cause of death was atelectasis, which he defined as a sudden collapse of a part of the whole of the lung tissue whereby oxygen or air does not enter the lung; it is caused by a tenacious plug of mucous in a bronchus far down in the lungs which prevents the air from entering and causes the collapse; such a plug

of mucous in a smaller or a larger bronchus will cause an atelectasis of a small or a larger section, depending upon where that bronchial tree is and upon the condition of the bronchus. There are other causes, such as psychic causes or sympathetic nerve stimulation. The heart beat and the lung and blood vessel contractions are controlled by the involuntary or sympathetic nervous system. Stimulation of or an assault upon the sympathetic nervous system, a psychic shock, a sudden fall on the ground, or a kick on the body, may produce a sudden atelectasis of the lungs. There could be a sympathetic nerve shock when a patient is under a complete general anesthetic, or a psychic shock, depending upon the depth of the anesthetic.

The doctor further testified that the baby was completely unconscious during the surgery and while it was under the influence of the anesthetic; customary treatment where atelectasis takes place during or subsequent to anesthesia depends upon how massive it is; sometimes it is so massive that it is too late to do anything; artificial respiration, oxygen and stimulants do no good. If the patient is so young as to be unable to tell its symptoms then it may be so rapid and so tremendous that it may be impossible to do anything to save the life. From the onset of an atelectasis until death the time is "all the way from right now to a few days." There are no premonitory symptoms of any kind. The symptoms occur after the atelectasis has taken place, not before. There is no way to determine when anyone is going to have an atelectasis. After it has set in, there is rapid breathing, such as air hunger, not getting sufficient oxygen, rapid pulse, and there may be pain in the chest. As to whether anything can be done when these symptoms occur depends on whether "there has been a massive [atelectasis], sometimes they don't have time to complain, . . . they are just gone right then." If the person is too young to complain about it you have none of those symptoms because it does not complain, doesn't speak.

He said further that in the case of a child not old enough to talk there are symptoms that a skilled doctor or nurse could discover right after the onset of an atelectasis. There is rapid breathing. In a case of that kind after cyanosis appears the child should receive oxygen and if the heart shows evidence of weakening it should receive heart stimulants. A baby under the influence of ether should be placed on its stomach, the face should be turned to one side; the child should be kept in that position if unconscious in order to keep the mucous

from clogging up—it gives better drainage; if the child vomits or if there is mucous in the mouth or throat it drains out much better instead of draining back into the lungs or bronchus.

In response to a question as to good hospital custom or the usual custom in regard to watching a patient in connection with atelectasis after surgery, the doctor testified that the usual custom has varied during and since the war because it has been impossible to receive as much help as was obtainable before the war; ''but there is some one in the room with these children until they are out of unconsciousness, in other words, until they are becoming conscious''; the usual custom in regard to post-surgical care of a child coming out from under ether who is unable to complain is that it is watched until it is out of unconsciousness. He stated that he examined the child prior to the operation and that with the exception of the tumor her condition was good,—normal. The tumor which he removed was not malignant.

That the operation was not a serious one is indicated by the doctor's statement to Mrs. Thomas after he had completed the operation that she could take her baby home at 4 o'clock in the afternoon.

The child was placed in the hospital as a paying patient and not as a charity patient. ■ A private hospital owes its patients the duty of protection. (*Meyer* v. *McNutt Hospital,* 173 Cal. 156, 159 [159 P. 436].) It was the duty of the hospital to use reasonable care and diligence in safeguarding a patient committed to its charge (*Valentin* v. *La Societe Francaise,* 76 Cal.App.2d 1, 4 [172 P.2d 359]; *England* v. *Hospital of the Good Samaritan,* 22 Cal.App.2d 226, 230 [70 P.2d 692]) and such care and diligence are measured by the capacity of the patient to care for himself. (Valentin case, *supra.*) ■ By reason of the tender age of appellant's baby respondent owed a higher degree of care in attending it than if she had been an adult.

A review of the cases arising under the general rule governing hospitals in their relation to their patients discloses the law to be that (a) a private hospital must exercise such reasonable care toward a patient as his known condition may require, and (b) it is liable for want of ordinary care. (*Welsh* v. *Mercy Hospital,* 65 Cal.App.2d 473, 478 [151 P.2d 17]; *England* v. *Hospital of the Good Samaritan,* 22 Cal. App.2d 226, 230 [70 P.2d 692]; *Valentin* v. *La Societe*

*Francaise,* 76 Cal.App.2d 1, 4 [172 P.2d 359]; *Guilliams* v. *Hollywood Hospital,* 18 Cal.2d 97, 99 [114 P.2d 1]; *Wood* v. *Samaritan Institution,* 26 Cal.2d 847, 851 [161 P.2d 556]; *Rice* v. *California Lutheran Hospital,* 27 Cal.2d 296, 302 [163 P.2d 860]; *Timbrell* v. *Suburban Hospital, Inc.,* 4 Cal.2d 68, 72 [47 P.2d 737]; *Williams* v. *Pomona Valley Hospital Assn.,* 21 Cal.App. 359, 361 [131 P. 888].)

It is unnecessary to discuss the point raised by respondent as to whether the degree of care, skill and diligence exercised by a hospital toward its patients must be shown to be the same as that which is generally exercised by hospitals in the same community, by reason of the fact that evidence on the question was supplied in this case by the testimony of the medical witness that the usual custom in hospitals is to watch a child coming from under anesthesia until consciousness has returned.

 It was the duty of respondent to observe the progress of the baby in its recovery from the effects of the anesthetic with such care and diligence as required for its comfort and safety, and whether respondent exercised such reasonable care under the circumstances of the case is for the determination of the jury. (*Valentin* v. *La Societe Francaise,* 76 Cal. App.2d 1, 5 [172 P.2d 359].)

The operating surgeon testified that in the case of an operation on an eight-month-old baby, as long as it is under an anesthetic it is either unconscious or bordering onto unconsciousness and from an atelectasis point of view it is advisable, until the child can crawl around, to have someone in the room to check on it at frequent intervals. He stated that he often had had relatives or parents stay with their children and had instructed them to notify the nurses if everything was not all right.

Mrs. Mitchell, the graduate nurse who was in charge of the room in which appellant's baby was left and of other rooms, testified that she visited the child several times between its return from the operating room and its death. It was established that she was not in the room during the 15-minute period preceding Mrs. Thomas's entry when she found the baby dead. During that period, according to the doctor's evidence, the atelectasis could have taken place and caused death. Although the nurse's aide, an unskilled person, was in the room she was engaged in changing the bed clothing on other beds and it is manifest from the evidence that she gave little if any attention to the Thomas baby in view of the

fact that death overtook it without her knowledge and even when Mrs. Thomas addressed her she stated that the baby was sleeping from the effects of the ether. It was at Mrs. Thomas's insistence that the nurse's aide picked the baby up and found that she was dead; her nails were blue and her hands were cold.

If the proper observation and care of the child had been maintained its condition would have been observed and there is a possibility that its life could have been saved. When reference is made to the doctor's evidence that atelectasis is caused by a plug of mucous in a bronchus or by sympathetic nerve stimulation that may come when a patient is under a general anesthetic; that there are no premonitory symptoms of any kind; that the symptoms occur after atelectasis has taken place; that there is no way to determine when a person is going to have an atelectasis; that in case of a child there are symptoms that a skilled doctor or nurse could discover right after the onset of an atelectasis; that the usual custom in regard to a child coming out from under ether is that it is watched until it returns to consciousness, it is clear that a reasonably careful management of respondent would have had a proficient nurse at the bedside of the baby during the time it was under the effect of the anesthetic and that reasonable care and diligence were not exercised when the only person in the room was an unskilled nurse's aide who was not watching over the baby but was changing the clothing and the bedding of other children. (*Valentin* v. *La Societe Francaise*, 76 Cal.App.2d 1, 4 [172 P.2d 359]; *England* v. *Hospital of the Good Samaritan*, 22 Cal.App.2d 226, 230 [70 P.2d 692].) Whether the nurse's aide would have noted the symptoms of atelectasis if she had watched the baby carefully is questionable, since she did not know that the baby's face was down on the mattress instead of on the side as it had been placed when the child was returned from the operating room and she did not recognize death until the knowledge was forced on her by the baby's mother.

Respondent maintains that the nonsuit was properly granted because of the allegation in the complaint that it permitted the child "to smother from a collapse of her lungs." It is argued that by reason of the testimony of the surgeon that atelectasis is caused by a clot of mucous in a bronchus, the allegation of smothering is completely negated by the evidence.

The complaint does not stop with that allegation but further alleges that the death of the child was brought about by the negligence of respondent "for failure to watch and protect said minor child while unconscious and under the influence of a general anesthetic." This allegation supplements the averment that respondent permitted the baby to smother and is sustained by the doctor's testimony. ▪ Such general allegation of negligence, if there had been no specific allegation of smothering, is sufficient to establish a duty of care under the general law and to permit proof of failure to render ordinary care. (*Guilliams* v. *Hollywood Hospital*, 18 Cal.2d 97, 99 [114 P.2d 1].)

▪ Furthermore, in reference to the term "smother" neither appellant nor his counsel nor the court is limited either by the technical medical definition of the word, if there be one, (none is suggested in the briefs and none appears in Dorland's Medical Dictionary) or by the fact that atelectasis is caused by a clot in a bronchus. In considering a pleading such as this the ordinary and customary meanings of words must be adopted rather than a technical definition that is known only to persons skilled in a particular science. "Smother" is defined as: "To destroy the life of by suffocation; to kill, murder, etc., by depriving of air" (Webster's New International Dictionary, 2d ed., 1939, p. 2376); "To suffocate by the prevention of breathing; to deprive of life by suffocation." (Oxford English Dictionary, vol. 9, p. 290.) "Suffocate" is defined as: "To kill by stopping respiration, as by strangling or asphyxiation; ... To extinguish or destroy by, or as by, deprivation of air" (Webster's, Id., p. 2520); "To kill (a person or animal) by stopping the supply of air through the lungs, gills, or other respiratory organs. To interrupt or impede respiration in (a person); to stifle, choke. ... To destroy as if by the exclusion of air; to smother, overwhelm, extinguish." (Oxford, Id., vol. 10, p. 109.) "Suffocation" is defined in Dorland's American Illustrated Medical Dictionary (17th ed., 1937, p. 1314), as "The stoppage of respiration, or the asphyxia that results from it."

"Strangle," which is used in the foregoing definitions, means: "(Trans.) To stifle, choke, or suffocate in any manner; esp. to interrupt the breathing of, by entering the windpipe; ... (Intrans.) To be strangled, or suffocated." (Webster's, p. 2490.) In Allen's Synonyms (1938 ed., p. 375) "choke," "smother," and "strangle" are listed as synonyms of "suffocate." One of the definitions of "atelectasis" given

in Dorland's Medical Dictionary (p. 161) is "partial collapse of the lungs."

Since all the words above defined mean to deprive a person or animal of air and since the collapse of a lung is caused by the inability of air to enter it, the objection to the allegation that the baby was permitted "to smother from a collapse of her lungs" is purely technical. The truth is that she died by reason of the fact that air was prevented from entering her lungs. This fact and not the technical word describing the means by which air was excluded is the gravamen of the complaint.

To the ordinary person who is without knowledge of medical terminology the term "smother" would mean to deprive of air—to prevent the entrance of air into the lungs by either external or internal stoppage of the air passages. Respondent is fully apprised by the complaint that appellant charges that his baby died for want of air and that the failure of air to enter its lungs was caused by respondent's negligence. Justice is not served when, by a hypertechnical objection to a pleading or by a trivial imperfection in the choice of words, a litigant is deprived of his right to have his case submitted to the decision of a jury, especially so when the words pleaded are commonly used and understood and the opposing party is not deceived or confused by their use.

The evidence may be thus epitomized: The baby's life was brought to a close by reason of the fact that its breathing organs were so obstructed that oxygen could not enter. Atelectasis was not necessarily fatal. Its symptoms may be readily recognized by a skilled doctor or nurse. It is the custom for hospitals in the community of respondent to watch a small child under anesthesia until it returns to consciousness. Appellant's baby was not safeguarded by having the attention of a skilled person and the unskilled nurse's aide did not give such attention to the baby as was in her power.

It was in the domain of the jury to determine from the evidence before it whether respondent had used the degree of care required of it under the rules of law above laid down and sustained by the decisions cited. If the case had been submitted to the jury upon no other evidence than that introduced before the nonsuit was granted a verdict in appellant's favor would have been justified. The granting of a nonsuit was error.

Appellant assigns several errors of the court in sustaining objections to questions, and since the case may be tried again

the alleged errors will be disposed of for the guidance of the court.

■ (a) The court sustained an objection to the question as to whether the parents of the child opposed the performance of an autopsy. The cause of the child's death was established by respondent's witness, the operating surgeon. The officials of the hospital did not request an autopsy and it does not appear that one was necessary. There was no occasion for an objection by the parents.

■ (b) The medical witness was asked whether an operation of the nature performed on the child would endanger life as much as an abdominal incision. The surgeon had testified that the operation was of a minor nature, so much so that it was his intention to permit the child to be taken home in the afternoon of the day on which the operation was performed. Neither party claimed that the operation was the cause of the death. The question was immaterial.

■ (c) The doctor was asked whether there was anything about the room in which the child was placed and its occupancy that in his opinion would be a cause for keeping the mother from the bedside while the child was under the anesthesia. The objection was sustained on the ground that it called for a conclusion. The doctor was unquestionably qualified to answer the question. There was evidence that the mother had been excluded from the room for the reason, as stated by the nurse in charge of the room, that she and other outsiders would consume oxygen that was necessary for the children. The doctor testified that in other cases he had permitted a parent or relative to remain in the room with a child until it had recovered from the effects of anesthesia and that the size of the room and the number of people therein would determine whether outsiders should be permitted to remain. He knew the size and condition of the room, the number of its occupants, the number and size of the windows, and other facts which, in his opinion, might or might not have justified the nurse in excluding Mrs. Thomas from the room. He should have been permitted to answer the question.

■ (d) An offer was made to prove by the mother of a boy who was in the room about the time appellant's baby was there that while he was under the influence of an anesthetic an attendant of the hospital remained in close proximity to his bed until he had completely recovered consciousness. The offer of proof was stated by counsel to have been

for the purpose of showing the custom with regard to watching a patient under anesthesia. The evidence was admissible for the purpose stated and for the additional purpose of negating the necessity of compelling Mrs. Thomas to absent herself in order to preserve oxygen as stated by the nurse.

(e) Three questions were propounded to Mrs. Mitchell, the graduate nurse, wherein she was asked to express her opinion concerning the effect of an anesthetic and the custom of hospitals to keep an attendant at the bedside of an anesthetized patient. Since these subjects were not touched upon in her direct examination objections on the ground that the questions were improper cross-examination were rightly sustained.

Judgment reversed.

Moore, P. J., and McComb, J., concurred.