ANGELINA HERNÁNDEZ RIVERA, Plaintiff and Appellant, *v.* GOVERNMENT OF THE CAPITAL, Defendant and Appellee.

No. 11344. Submitted May 18, 1958.—Decided June 30, 1960.

*César Andréu Ribas* for appellant. *Luis Blanco Lugo* and *Alberto Picó* for appellee.

Mr. Justice Serrano Geyls delivered the opinion of the Court.

There is no dispute as to the facts in this action for damages. Arranged in chronological order they are as follows:

On April 25, 1951 Marta Iris Hernández Rivera, a three year old girl, entered the Hospital of the Capital, an institution of public charity. She was suffering from a disease which later proved to be meningitis. She was placed in the children's ward under the care of Dr. José E. Sifontes, hospital physician. The ward consisted of two rooms, one with sixteen beds and another with nine. Helen Gutiérrez de Soto, a graduate nurse, was in charge of both rooms with the help of Dolores Dones, a nurse's aide. The principal duties of the nurse's aide were to clean and change the children's clothes and to prepare their meals and feed them. When she was not busy with these matters she watched the smaller room.

Since her confinement Marta Iris underwent a treatment of chloromycetin, luminal, and serum, the amount of these medicines being modified according to the patient's condition. She was seriously ill the first few days, but since May 1 the immediate danger of death had passed, although she was not completely well. Her temperature had fluctuated daily and on May 3 it read 100°F at 8 o'clock a. m. and 99° at 4 p. m. The normal temperature is 98.6°F. The pulse rhythm and her breathing had also fluctuated, but on May 3 they were close to normal. She was injected luminal when

she was in a state of hypertension, if a physician so authorized. On April 30 and May 1 she was not given luminal but it was administered to her again on the evening of May 2 "to quiet her" because "she was screaming a lot and was very restless." That same night the child had "given a scare" to Mrs. Soto, the nurse, when she attempted to climb a folding screen which separated her bed from those of other patients. The nurse saw her and lowered her from the screen and after this incident she was injected luminal upon one of the doctor's orders.

On the evening of May 3, Mrs. Soto was in charge of 23 patients, "children and babies," fourteen of whom were in the room with Marta Iris and nine in the other room. Among them there were at least four seriously ill: one with encephalitis,[1] another with tuberculous meningitis, another recently operated who was being administered serum and had to be watched for removing it and another "seriously ill" who required applications of external heat. Marta Iris occupied the fourth or fifth crib in the center of the room, entering from the right. The crib, like all other hospital cribs, had side rails but no lid whatsoever. The child wore a nightgown which had a string in the upper part, around the neck. That was the usual garment for sick children.

During the afternoon of May 3, Marta Iris was restless, crying and moaning. Her restlessness increased after 8 o'clock p. m. Shortly thereafter —there is no evidence of the exact time—since the child was screaming and restless, Mrs. Soto tied her hands and feet, in the shape of a cross, to the side rails of the crib. This, however, upset the patient further and the nurse untied her about two minutes later. Then the child "turned on her stomach and remained apparently quiet" but not asleep. "The children, when we tie them, are afraid to be tied, and remain apparently quiet

---

[1] This patient "had to be watched" but her crib was close to the nurse's desk.

because they don't want to be tied up again." It was customary for the hospital to tie restless children and the nurses did not need a doctor's permission to do so.

As soon as the child calmed down, the nurse raised the side rail of the crib, turned off the light in the room and stepped into the adjoining room.[2] The rooms were separated by a transparent glass. From her position the nurse could see "all the children in general" but not Marta Iris "directly." Besides, she did not look through the glass because she was changing the serum of a very sick child who had just been operated. During all that time the nurse's aide was outside the two rooms, preparing the children's bottles in a separate kitchen.

About five minutes after she had left Marta Iris the nurse was called by Dr. Sifontes. She went with the doctor to the place where the child's crib was located and found her dead, hanging by the string of her nightgown. The string had caught in a small screw on one side of the crib when the child had apparently tried to climb down. The death was caused by "asphyxia or strangulation."

Dr. Sifontes had been making one of his several night rounds to examine the patients. He used a flashlight to light the cribs because the desk light was not sufficient to "notice . . . the finer things that enter into a patient's observation." On that round and at 8:45 p. m. he found Marta Iris in the afore-described position. In his opinion the child had died five or ten minutes earlier because her temperature was normal and there was no rigidity in the body. After verifying the death, he notified the nurse immediately.

On several occasions the child's mother and grandmother had volunteered to care for the patient at daytime or nighttime and they were turned down saying that "there were

[2] In a corner of the room there was a desk for the nurse. It had a small lamp with a shade which mainly lit the desk but permitted a view of the whole room. That lamp remained lit when the nurse left the room.

more than enough nurses there" and that there was no risk whatever for the child. It was stipulated by the parties that the Hospital Regulations prohibited that persons not belonging to the personnel attend the patients.

The trial judge dismissed the complaint because in his judgment it was "a lamentable and unfortunate accident for which the defendant cannot be held liable." He added that "in this case the evidence does not indicate any negligence on the part of the defendant." The appellant adopts the opposite view.

We shall immediately dispose of several questions which do not require discussion. In the first place, it is known that by law and the decisions on the matter, the Government of the Capital is liable for the negligent acts of its employees and officers performed in the discharge of their duties.[3] That liability is not altered when the negligent acts are committed while rendering a service, which, as in the present case, is offered gratuitously.[4] It is so admitted by the defendant. In the second place, neither the Government of the Capital nor the Director of the Hospital are charged with negligence in the selection of the employees and officers who acted in this matter. The parties expressly stipulated so. Finally, it was not alleged in the suit nor was evidence presented as to negligence of the defendants in the discharge of their purely professional duties. Therefore, we do not have to face the thorny problem, which has so often divided American courts, of the scope of the liability of a public or private hospital for the actions of its employees and officers, and other persons who practice within the pre-

---

[3] Section 46 of Act No. 99 of May 15, 1931 (Sess. Laws, p. 626), 21 L.P.R.A. § 561; *Serra* v. *Transportation Authority*, 67 P.R.R. 574, 580–81 (1947); *Rodríguez* v. *People*, 75 P.R.R. 377, 387 (1953).

[4] *Serra* v. *Transportation Authority, supra* at 587; *Carrasquillo* v. *Am. Missionary Association*, 61 P.R.R. 837, 847 (1943).

mises, performed strictly within the scope of their professional competence.[5]

The facts as stated raise the sole question of whether the defendant Government of the Capital, acting through some of the employees and officers of the hospital, was negligent in failing to give the child Marta Iris Hernández Rivera the necessary vigilance, protection, and care. We are dealing briefly with an alleged negligence in the performance of acts classified by American case law as "administrative" or "ministerial" and which may be briefly defined as routine acts toward the "care, protection, and the customary hospitalization" of the patient. *Fowler* v. *Norways Sanitarium*, 42 N. E. 2d 415, 419 (Ind. 1942); *Stuart Circle Hospital Corp.* v. *Curry*, 3 S. E. 2d 153, 157–59 (Va. 1939); *St. Lukes Hospital Ass'n* v. *Long*, 240 P.2d 917, 921 (Col. 1952); *Capasso* v. *Square Sanitarium*, 155 N.Y.S. 2d 313, 316–17 (1956).

The standards governing such liability are simple and may be explained briefly.[6] As so frequently occurs in the field of torts it is in the application of the general standards to the specific facts where difficulties are encountered.

---

[5] It has been said that an act is within the scope of the practice of medicine where it consists of one of three things: "First, in judging the nature, character, and symptoms of the disease; second, in determining the proper remedy for the disease; third, in giving or prescribing the application of the remedy to the disease." *Underwood* v. *Scott*, 23 Pac. 942, 943 (Ka. 1890). See the cited case of *Carrasquillo*, where the hospital as well as the intern who attended the patient was ordered to pay compensation for damages to the patient.

[6] See, in general, Harbison, *The Standard of Care Owed by a Hospital to Its Patients*, 2 Vand. L. Rev. 660 (1949); Danko and Matthews, *Liability for Non Attendance of Patient*, 26 N. Dame Law 314 (1951); Annotations in 22 A.L.R. 341 (1923), 39 A.L.R. 1431 (1925), 124 A.L.R. 186 (1940), 31 A.L.R. 2d 1118, 1128 (1953); Hayt, Hayt and Groeschel, Law of Hospital, Physician and Patient, 198–209 (1952); *Rice* v. *California Lutheran Hospital*, 163 P.2d 860, 862 (Cal. 1945); *Lexington Hospital, Inc.* v. *White*, 245 S. W. 2d 927, 929–30 (Ky. 1952).

A public or private hospital is not an insurer of its patients against injuries inflicted by themselves or caused by other persons. The principle of liability without fault, regardless of its apparent social usefulness, is not authorized by our laws in this activity. The hospital is liable for those damages caused by acts of commission or omission performed by its employees and officers and which are comprised within the scope of their duties. The hospital owes the patient the reasonable care and attention required by the circumstances, and these are measured by standards of reasonability and prudence. The practices prevailing in the community can serve as a guide.[7] The decisive factors in each case are the specific conditions and conduct of the patient, his capacity to care for himself, the hospital's actual information as to those conditions and that conduct and capacity and the one it should obtain if it properly uses the skill and experience of its professional employees to verify them, and the dangers afforded by the surroundings. The duty of foreseeability does not extend to all the hazards imaginable which could conceivably threaten the patient's security but to those which are likely to happen and which can be anticipated by a prudent person.[8] Briefly, the mythical but indispensable figure of the "reasonably prudent man"[9] defines the rule of conduct, and the hospital will be liable if there is damage which in the particular circumstances of the case could reasonably have been foreseen and prevented.

■■ Under the circumstances of this case, it is necessary to explain further one of the afore-stated factors. The

---

[7] In this case the parties did not present evidence of those practices. However, the attendant circumstances having been considered, that evidence is convenient but not indispensable. *Stallman* v. *Robinson*, 260 S. W. 2d 743, 749 (Mo. 1953) ; *McDonald* v. *Foster Memorial Hospital*, 338 P.2d. 607, 616–17 (Cal. 1959).

[8] On the standard of foreseeability see in general, 2 Harper and James,. *The Law of Torts* 1134–1151 (1956).

[9] Seavey, *Negligence, Objective or Subjective?*, 41 Harv. L. Rev. 1 (1927) ; Prosser, *The Law of Torts* 124–146 (1955).

standards of attention and care are more demanding when the patient suffers from a physical or mental abnormality which prevents him or makes it difficult for him to take care of himself. On such occasions, depending on the specific circumstances, the hospital can be required to adopt precautionary measures additional to the ordinary ones and which can even include continuous and uninterrupted vigilance of the patient. Some examples are the cases of patients with diverse manifestations of mental derangements or deficiencies,[10] or who are delirious,[11] epileptic,[12] or in a state of complete or partial unconsciousness caused by the use of drugs or anesthetics,[13] etc. Likewise, the standards of higher diligence govern the conduct of the hospital where sick children are concerned.[14] By reason of the child's age, a higher degree of care and attention is required and it must increase if abnormal reactions caused by the disease are added to the incapacity of age.

After applying the general and specific standards to the particular circumstances of the present case, it is our opinion that the Hospital of the Capital was decidedly negligent in its duty to protect and care for the patient Marta Iris Hernández Rivera and that the damage caused could have reasonably been foreseen and avoided.

This is the case of a three-year old child, who although her condition had improved, was still suffering from meningitis, in a feverish and very restless condition, and for

---

[10] *Gaccioni* v. *State*, 18 N.Y.S. 2d 161, 165 (1940); *Burtman* v. *State*, 67 N.Y.S. 2d 271, 273 (1947); *United States* v. *Gray*, 199 F.2d 239, 242, 243 (10 Cir. 1952); *Stallman* v. *Robinson, supra* at 747; *Murray* v. *St. Mary's Hospital*, 113 N.Y.S. 2d 104, 105 (1952).

[11] *Tate* v. *McCall Hospital*, 196 S. E. 906, 908 (Ga. 1938); *Spivey* v *St. Thomas Hospital*, 211 S. W. 2d 450, 455 (Tenn. 1947).

[12] *Hogan* v. *Clarksburg Hospital Co.*, 59 S. E. 943, 945 (W. Va. 1907).

[13] *Thomas* v. *Seaside Memorial Hospital*, 183 P.2d 288, 293 (Cal. 1947); *Rice* v. *California Lutheran Hospital, supra* at 863–64.

[14] *St. Lukes Hospital Ass'n* v. *Long, supra* at 921;. *Capasso* v. *Square Sanitarium, supra* at 316; *Thomas* v. *Seaside Memorial Hospital, supra* at 292–93; Prosser, *op. cit at* 127–128; *Irizarry* v. *People*, 75 P.R.R. 740, 745 (1954).

all these reasons, completely unable to care for herself.[15] The hospital had full knowledge of her disease and condition and the nurse who attended her at the time of her death knew that at least once the child had left her crib and climbed atop a folding screen in a situation of grave hazard. That nurse likewise knew that the child had been very restless some minutes before the accident, to such a degree that she deemed it proper to tie her hands and feet to the side rails of the crib. She also knew that when she untied her the child had not fallen asleep but was "apparently quiet" and that according to her experience children usually assume that condition of stillness when they are untied "because they are afraid to be tied again."

What attention, protection, and care did the hospital provide for a patient under those conditions and conduct? It placed her in a ward with 22 other patients, all children, four of whom required special supervision. That ward was entrusted to a graduate nurse assisted by a nurse's aide, but the latter, due to the nature of her duties, used to spend part of the time outside the two rooms which composed the ward and at the time of the accident was outside. The hospital also provided a doctor who made several rounds during the night. The patient occupied a crib with side rails but with no other protection to prevent her from getting out, and the nurse, knowing her condition of great restlessness and the "scare" of the previous night, did not provide that protection upon leaving her alone. At the time of the accident there was only one small desk light covered by a shade to light the fourteen patients who were in the room with Marta Iris. The nurse was outside the room, busy changing the serum of one of the very sick patients, in a position where she could observe the adjoining room through a glass, but not Marta Iris directly. As a matter of fact, she did not look at Marta Iris while performing the said task.

---

[15] *St. Lukes Hospital Ass'n* v. *Long, supra* at 921.

We believe that the hospital could have given Marta Iris the protection and care required by her condition by the use of certain simple measures at a minimum cost. Thus, for example, it could have assigned an additional nurse at the time when the aide was outside the ward or when there were several patients who required special vigilance; it could have grouped the latter in such a way that upon assisting one of them the nurse could, at the same time, watch the others closely; and provided cribs so equipped as to make it impossible for restless children to get down. As to the nurse, even in the harrying circumstances in which she found herself due to the excessive number of patients in her charge and the serious condition of some of them, common experience says that she could have taken measures to prevent Marta Iris from leaving her bed in her absence; either to have waited for her to be completely asleep before leaving her; or to wait for the return of the nurse's aide or the doctor's round and entrust to them the vigilance of the child. We cannot escape the conviction that some of those measures in themselves would have rendered the occurrence of the accident extremely improbable and that the combination of several of them would have made it impossible. We are likewise convinced that under the specific circumstances of this case and which we have described in detail, the hospital was negligent in its duty to reasonably protect and care for the patient.

We are told, however, that this was an "unusual" accident ( as classified by the nurse and physician) and that the hospital could not foresee that it would occur as it did. We believe, in the first place, that it is not so unusual for a three-year old child and in a state of fever and great restlessness, to try to leave a bed with side rails (an act which under the circumstances of the case was indeed clearly foreseeable) and become entangled in her nightgown or in the string around her neck and hurt herself. However, even assuming that it was accepted that the hospital could not

foresee the specific manner in which Marta Iris lost her life, that does not help its case any. The requirement of foreseeability "does not mean that the precise hazard or the exact consequences which arose should have been foreseen. . . . 'When it is found that a man ought to have foreseen in a general way consequences of a certain kind, it will not avail him to say that he could not foresee the precise course or the full extent of the consequences, being of that kind, which in fact happened.'" 2 Harper and James, *op. cit.* at 1147; Prosser, *op. cit.* at 258–266; *Spivey* v. *St. Thomas Hospital, supra* at 455–57; *Lexington Hospital* v. *White, supra* at 930–31; *Munsey* v. *Webb,* 231 U.S. 150, 155–56 (1913). Even if it could not have exactly anticipated that the child was going to die hanged by the neck from the string of her nightgown, yet the hospital had all the necessary information to foresee that in her condition, Marta Iris could try to abandon the crib, as she had done the previous evening, and as a result of such action fall from the crib, or climb the folding screen or walk and fall from a window or some stairs, or touch sharp instruments or electrical apparatus of the hospital, etc., and be subject to grave hazards on all these occasions. It was its duty to protect her against those hazards and that protection would have prevented the accident which occurred and which belonged to the same general category of those previously described.

For the reasons stated we find that the Government of the Capital acted negligently and we hereby award damages to the plaintiff for the death of her daughter and the loss of her companionship and affection. After considering all the elements of the case we believe that the amount of $15,000 plus all the costs of the suit and $1,500 for attorney's fees is reasonable.

The judgment appealed from is reversed and a new judgment will be entered pursuant to this opinion.

Mr. Justice Belaval dissented.