[No. F060420. Fifth Dist. Jan. 12, 2012.]

PAYTON WALKER, a Minor, etc., et al., Plaintiffs and Appellants, v. SONORA REGIONAL MEDICAL CENTER et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts V. and VI. of the Discussion.

**COUNSEL**

Kirtland & Packard, Robert K. Friedl; Law Office of Michael W. Milward, Ellen D. Vogt and Michael W. Milward for Plaintiffs and Appellants.

Porter Scott, Norman V. Prior, Jonathan A. Corr and Thomas L. Riordan for Defendants and Respondents.

## OPINION

**KANE, J.**—Plaintiff Amber Walker gave birth to a child with cystic fibrosis approximately one year after her personal physician, defendant Donavon Teel, M.D., failed to inform her that she tested positive as a carrier of cystic fibrosis. The present appeal concerns the potential liability, if any, of defendant Sonora Regional Medical Center (the Hospital) for its limited role in the laboratory testing and reporting process. Amber went to the Hospital laboratory for her cystic fibrosis screening test that was ordered by Dr. Teel's office. The Hospital took a blood specimen and sent it to an outside laboratory that performed the genetic testing. When the laboratory results of the genetic testing were received by the Hospital, it promptly transmitted them to Dr. Teel. Unfortunately, Dr. Teel failed to advise Amber of the results. Amber, along with her husband, Adam, and their child born with cystic fibrosis, Payton, filed a complaint for damages against both Dr. Teel *and* the Hospital, alleging theories of medical and corporate negligence.[1]

The Hospital moved for summary judgment primarily on the ground that it had no duty to directly notify Amber of the laboratory results.[2] According to the Hospital's motion, its sole duty under the circumstances was to transmit the laboratory results to Dr. Teel, whose responsibility it was to inform and counsel his patient regarding the same. The trial court agreed with the Hospital's analysis on the issue of duty, concluded that the Walkers' various claims of liability against the Hospital were without merit, and granted the motion for summary judgment. The Walkers appeal. We will affirm.

## FACTS AND PROCEDURAL HISTORY

On August 31, 2004, Amber selected Dr. Teel, of Hillside Obstetrics & Gynecology Medical Group, Inc., to be her personal physician for the care of her pregnancy. She knew of Dr. Teel because he had been in practice a long time as an OB/GYN in Sonora, had delivered babies for friends of hers, and she understood that he was affiliated with and delivered babies at the Hospital, where she wanted her baby to be born. At that time, however, she suspected she was having a miscarriage, which Dr. Teel confirmed, and the miscarriage occurred days later.

---

[1] For convenience, we sometimes refer to members of the Walker family by first names. No disrespect is intended.

[2] The motion for summary judgment was brought jointly by the Hospital and by codefendant, Adventist Health CA Medical Foundation (Adventist), which was allegedly the owner or operator of the Hospital. The Walkers' appeal does not present any cogent argument or factual basis to challenge the summary judgment ruling in favor of defendant Adventist. We therefore deem any appeal regarding Adventist to be abandoned.

On January 27, 2005, Amber returned to Dr. Teel's office for care of a new pregnancy. She was examined by Nurse Practitioner Cheryl Smith, an employee of Dr. Teel's, who took Amber's history and confirmed the pregnancy. Routine prenatal laboratory tests were ordered. A cystic fibrosis screening test was also ordered.[3] The purpose of a cystic fibrosis screening test is to detect a person's genetic predisposition to having a child with cystic fibrosis. If a person is found to test positive for the cystic fibrosis mutation, they are deemed a "carrier" and the chances of that person having a child with cystic fibrosis will be one in four if his or her reproductive partner is also a carrier.

Amber went to the Hospital outpatient laboratory for her cystic fibrosis screening test. A blood specimen was taken, but the Hospital laboratory did not actually perform the genetic testing. Instead, they sent the blood specimen to Associated Regional & University Pathologists (ARUP), a laboratory in Salt Lake City, Utah, for processing. The ARUP laboratory processed the blood specimen and determined that Amber had a genetic abnormality at "Allele 1," indicating that she was a carrier of cystic fibrosis. On February 3, 2005, the Hospital laboratory received the report from the ARUP laboratory showing the abnormal results of Amber's cystic fibrosis screening. On that same day, the Hospital laboratory electronically transmitted the laboratory results to Dr. Teel, and Dr. Teel personally reviewed the results at that time. In transmitting the laboratory results, the information was reformatted from the ARUP report. The Hospital's transmitted version of the laboratory results also included a note stating: "Heterozygous: One mutation was identified indicating this individual is at least a carrier of CF."

When Dr. Teel saw the laboratory results transmitted by the Hospital laboratory on February 3, 2005, he recognized immediately that Amber tested positive for cystic fibrosis at Allele 1 and negative for cystic fibrosis at "Allele 2." He made notations to that effect on the report—including a notation to review the chart and a circle around the test results—so that he would be sure to inform Amber of the results at her upcoming appointment.[4] Amber had experienced another miscarriage and she had a followup appointment scheduled for February 15, 2005. However, Dr. Teel failed to inform her of the cystic fibrosis test results at that time. On February 22, 2005, Dr. Teel's

---

[3] It is not entirely clear from the record whether the test was initiated by Dr. Teel or by his assistant, Nurse Practitioner Smith. That detail has no bearing on our opinion regarding the Hospital's duty regarding the laboratory results. What *does* matter is that the test was duly ordered by Dr. Teel's office, Dr. Teel was Amber's physician, and therefore (as we explain below) the laboratory report had to be sent by the Hospital to Dr. Teel's office. For the sake of brevity and ease of expression, we refer to the test as being ordered by Dr. Teel's office or by Dr. Teel.

[4] The circle encompassed both the negative and the positive cystic fibrosis results (i.e., Allele 1 and Allele 2).

office received the laboratory report from the ARUP laboratory. The report clearly flagged the abnormal findings and disclosed that Amber was a carrier of cystic fibrosis. Dr. Teel also made a notation on that report to review it with his patient, but he failed to do so.

On June 28, 2005, Amber returned to Dr. Teel's office and he found that she was five to six weeks pregnant. During the subsequent course of her pregnancy, Amber had appointments at Dr. Teel's office for prenatal care on July 13, 2005, August 9, 2005, September 6, 2005, October 3, 2005, November 7, 2005, December 9, 2005, January 6, 2006, January 20, 2006, and February 7, 2006. Dr. Teel did not inform Amber on any of these occasions that she tested positive for the cystic fibrosis mutation. At the July 13, 2005 office visit, when Amber was seven to eight weeks pregnant, Nurse Practitioner Smith filled out a new prenatal chart. On the first page of that chart, Smith wrote that Amber declined cystic fibrosis testing because "C.F. testing prev. neg." According to Smith, she offered the testing but Amber declined, saying it was previously negative. Amber denied that she ever told Smith that the prior test was negative.

Amber gave birth to her daughter, Payton, on February 12, 2006. On October 10, 2007, Payton was officially diagnosed with cystic fibrosis by pediatric physicians at Children's Hospital & Research Center Oakland.

On July 9, 2008, the Walkers filed a complaint for damages setting forth four causes of action. According to the complaint, if Amber and Adam Walker had been advised of the risk that their offspring would have cystic fibrosis, they would not have conceived Payton. The named defendants in each cause of action included Dr. Teel and the Hospital. The first cause of action was by Payton Walker for medical negligence against all defendants. The second cause of action was by Amber and Adam Walker for medical negligence against all defendants. The basis of the first two causes of action was an alleged duty of care on the part of both Dr. Teel and the Hospital to notify and counsel Amber of the results of the cystic fibrosis screening test. The third cause of action was against the Hospital on a theory of corporate negligence. The third cause of action alleged that the Hospital, as a hospital, owed a duty to (1) directly inform and counsel Amber concerning the laboratory results, (2) invoke policies to ensure that Amber would be informed and counseled concerning the laboratory results, and (3) use reasonable care in selecting and supervising staff physicians such as Dr. Teel. Additionally, the third cause of action included a potential claim that Dr. Teel was the Hospital's ostensible agent. The fourth cause of action was against all defendants for negligent infliction of emotional distress and was based on the same negligence allegations set forth in the first three causes of action.

The Hospital filed its motion for summary judgment, or, in the alternative, summary adjudication, on May 29, 2009. In essence, the Hospital asserted that it was not negligent because it did not have a duty to directly disclose the laboratory results to Amber. Its duty was to faithfully transmit the laboratory results to Dr. Teel, which it did. Additionally, the Hospital set forth facts indicating that it was not corporately negligent for its selection or evaluation of Dr. Teel as a member of the Hospital's medical staff. Further, the Hospital's motion set forth facts showing that it was not vicariously liable for Dr. Teel's acts or omissions (i.e., no ostensible agency).

On July 30, 2009, the Walkers filed their opposition to the motion. They argued that under the concept of the corporate negligence, the Hospital owed a duty to disclose the cystic fibrosis results to Amber and/or it owed a duty to invoke policies that ensured such disclosure. The Walkers' opposition also asserted that the manner in which the Hospital reformatted the laboratory results may have misled Dr. Teel into believing the results were negative. Finally, the Walkers argued there was a triable issue of fact whether Dr. Teel was an ostensible agent of the Hospital. On August 7, 2009, the Hospital filed its reply. Each party also filed written objections to portions of the evidence presented by the other party. Oral argument was heard by the trial court on August 14, 2009.

On November 2, 2009, the trial court issued its written order granting the Hospital's motion for summary judgment. In that order, the trial court first discussed the Walkers' particular claims of "Direct Negligence" against the Hospital. One such claim was that when the Hospital reformatted the laboratory results that arrived from the ARUP laboratory, the Hospital may have presented the results in a manner that failed to alert Dr. Teel that Amber tested positive. The trial court found that argument failed because, under the undisputed facts, (1) the Hospital's reformatted results clearly indicated that Amber was a carrier of cystic fibrosis, (2) Dr. Teel received both the reformatted results from the Hospital and the report from the ARUP laboratory, and (3) Dr. Teel's deposition testimony confirmed that he understood the reformatted results to mean that Amber was a carrier of cystic fibrosis and he even marked the results and made notations because he intended to discuss them with Amber at her next office visit. Thus, the trial court concluded that the manner in which the information was presented to Dr. Teel by the Hospital was "not a factor in Amber's not being informed that she was a carrier."

As to the Walkers' assertion that the Hospital owed a duty to Amber to directly inform her of the cystic fibrosis test results, the trial court explained that the Walkers' position was contrary to both state and federal law governing how and to whom laboratory results are to be released. According

to the trial court, those laws provide that such laboratory results may only be released to the authorized health care professional who ordered the test. While a patient may make a special request to directly obtain laboratory results, that was not done here. Thus, the trial court held the Hospital did not breach a duty owed to Amber when it provided the laboratory results solely to Dr. Teel. Finally, the trial court found the undisputed facts established that Dr. Teel was not an actual or ostensible agent of the Hospital, and therefore vicarious liability was also negated. Since the Hospital succeeded in showing that each of these claims against it were without merit, the trial court granted the Hospital's motion for summary judgment. In separate orders, the trial court also ruled on each of the evidentiary objections made by the Walkers and the Hospital.

On December 4, 2009, dismissals were entered of the remaining defendants, including the dismissals of Dr. Teel, Hillside Obstetrics & Gynecology Medical Group and Nurse Practitioner Smith. On April 29, 2010, the trial court entered a judgment against the Walkers and in favor of the Hospital and Adventist. The Walkers' timely appeal followed.

## DISCUSSION

### I. *Standard of Review*

Summary judgment is appropriate when all of the papers submitted show there is no triable issue of any material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)[5] "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

A defendant may move for summary judgment if it is contended that the action has no merit. (§ 437c, subd. (a).) A defendant meets its initial burden of showing a cause of action is without merit if that party has shown that one or more elements of the cause of action cannot be established, or that there is a complete defense thereto. (*Id.*, subd. (p)(2).) Once the defendant makes such a showing, the burden shifts to the plaintiff to produce evidence demonstrating the existence of a triable issue of material fact. (*Ibid.*; *Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 849.)

On appeal from a summary judgment, our task is to independently determine whether an issue of material fact exists and whether the moving

---

[5] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

party is entitled to summary judgment as a matter of law. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601 [50 Cal.Rptr.2d 431].) "We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and standards." (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1373 [105 Cal.Rptr.2d 699].) We apply the same three-step analysis required of the trial court. First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in the moving party's favor. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503 [10 Cal.Rptr.3d 568]; *Chevron U.S.A., Inc. v. Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674].)

In so doing, we view the evidence in the light most favorable to the party opposing the motion; we liberally construe the opposing party's evidence, strictly construe the moving party's evidence, and resolve all doubts in favor of the opposing party. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64 [74 Cal.Rptr.3d 108, 179 P.3d 905]; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].)

## II. *The Walkers' Theories of Liability Against the Hospital*

At the outset, we identify the distinct negligence theories asserted against the Hospital that must be addressed in this appeal. These claims were as follows: (1) the Hospital had a duty of care to directly disclose to Amber that she tested positive for cystic fibrosis, and it breached that duty; (2) the Hospital had a duty of care to invoke policies and procedures to ensure that Amber would be informed and counseled regarding the cystic fibrosis test results, and the Hospital breached that duty; (3) the manner in which the Hospital transmitted and reformatted the laboratory results to Dr. Teel was negligent in that it obscured the fact that Amber tested positive, which negligence was a substantial factor in the failure to inform her of the results; and (4) the Hospital was vicariously liable because Dr. Teel was its ostensible agent.[6]

---

[6] Although the distinct causes of action were not separately pleaded, they still may be adjudicated. (§ 437c, subd. (p)(2).) We note there was one other theory of negligence alleged; namely, the claim that the Hospital allegedly breached its corporate duty to screen the competency of its medical staff and, in particular, Dr. Teel. The Hospital's motion for summary judgment addressed that claim, presenting evidence that the Hospital complied with its

Our next step is to consider whether the Hospital's showing was sufficient to negate each of these alleged causes of action and, if so, whether the Walkers' opposition demonstrated the existence of a triable issue of fact.

### III.   *The Hospital Had No Duty to Inform of Laboratory Results*

We begin with the issue of the Hospital's duty of care to Amber concerning the laboratory test results showing that she tested positive as a carrier of cystic fibrosis. Again, the Walkers' complaint alleged that the Hospital owed a duty of care to directly advise Amber of the laboratory results. The Hospital's motion for summary judgment and/or summary adjudication argued that, under the circumstances of this case, its duty to report the laboratory results was limited to promptly transmitting those results to Dr. Teel's office, which it did. The trial court agreed with the Hospital and, as explained below, we think the trial court got it right.

■     Duty, of course, is an essential element of a negligence cause of action. The elements of a cause of action for negligence are " ' "(a) a *legal duty* to use due care; (b) a *breach* of such legal duty; [and] (c) the breach [was] the *proximate or legal cause* of the resulting injury." ' [Citation.]" (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917–918 [50 Cal.Rptr.2d 309, 911 P.2d 496].) The existence and the scope of a duty of care in a given factual situation are issues of law for the court. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207]; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) "Since the existence of a duty of care is an essential element in any assessment of liability for negligence [citations], entry of summary judgment in favor of the defendant in a negligence action is proper where the plaintiff is unable to show that the defendant owed such a duty of care." (*Clarke v. Hoek* (1985) 174 Cal.App.3d 208, 213–214 [219 Cal.Rptr. 845].) The determination that a legal duty is owed in a particular set of circumstances is " ' "only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' " (*Ballard v. Uribe, supra,* at p. 572, fn. 6.)[7]

---

selection and screening responsibilities. No opposition evidence was presented. On appeal, the Walkers have made no argument regarding that particular claim and have clearly abandoned it.

[7] Courts have enumerated a number of factors that have been considered in determining whether a particular duty of care is owed under a given set of circumstances. These factors include: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561].)

In our analysis of the issue of the Hospital's duty in this case, we shall first consider how the case law has generally described a hospital's duty to its patients.

## A. Overview of a Hospital's Usual Duty to Patients

■ A hospital's conduct must be in accordance with that of a person of ordinary prudence under the circumstances. (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 998 [35 Cal.Rptr.2d 685, 884 P.2d 142].) When a patient is admitted into the care of a hospital, the hospital must exercise reasonable care to protect that patient from harm. (*Elam v. College Park Hospital* (1982) 132 Cal.App.3d 332, 340 [183 Cal.Rptr. 156] (*Elam*), citing *Rice v. California Lutheran Hospital* (1945) 27 Cal.2d 296, 299 [163 P.2d 860] (*Rice*).) " ' "The extent and character of the care that a hospital owes its patients depends on the circumstances of each particular case." ' " (*Rice, supra*, at p. 299.) In *Rice*, where a patient was scalded after a hospital employee left hot tea near the patient's bedside, the Supreme Court stated that a hospital owes its patients " ' "the duty of protection, and must exercise such reasonable care toward a patient as his known condition may require." ' " (*Ibid.*) In that same opinion, the Supreme Court explained further that a hospital is "under a duty to observe and know the condition of a patient. Its business is caring for ill persons, and its conduct must be in accordance with that of a person of ordinary prudence under the circumstances, a vital part of those circumstances being the illness of the patient and incidents thereof." (*Id.* at p. 302.)[8]

■ In *Elam*, the Court of Appeal held that a hospital may be liable under the doctrine of "*corporate* negligence" for the malpractice of independent physicians and surgeons who were members of hospital staff, and availed themselves of the hospital facilities, but were not agents or employees of the hospital. (*Elam, supra*, 132 Cal.App.3d at p. 335, italics added.)[9] That was because a hospital generally owes a duty to screen the competency of its

---

[8] As summarized by one legal treatise: "The professional duty of a hospital is primarily to provide a safe environment within which diagnosis, treatment, and recovery can be carried out. Patients in a hospital are owed the duty of reasonable care, considering the true condition of each patient, and the measure of that duty is the degree of care and skill used by hospitals generally in the community according to what the undertaking to treat the particular patient requires in each instance. In short, the business of a hospital is caring for ill persons, and its conduct must be in accordance with that of a person of ordinary prudence under the circumstances, a vital part of those circumstances being the illness of the patient and its incidents." (36A Cal.Jur.3d (2007) Healing Arts & Institutions, § 478, pp. 221–222, fns. omitted.)

[9] *Elam* explained that "[t]he term 'corporate negligence' has been commonly used to describe hospital liability predicated *not* upon vicarious liability . . . , but upon its violation of a duty—as a corporation—owed directly to the patient which resulted in injury." (*Elam, supra*, 132 Cal.App.3d at p. 338, fn. 5, italics added, citation omitted.)

medical staff and to evaluate the quality of medical treatment rendered on its premises. (*Elam, supra,* at p. 347.) Thus, a hospital could be found liable for injury to a patient caused by the hospital's negligent failure "to insure the competence of its medical staff through careful selection and review," thereby creating an unreasonable risk of harm to the patient. (*Id.* at p. 341.)

■ A California civil jury instruction succinctly characterizes a hospital's duty to its patients as follows: "A hospital must provide procedures, policies, facilities, supplies, and qualified personnel reasonably necessary for the treatment of its patients." (CACI No. 514.) The instruction would appear to be an accurate distillation of the case law applicable when patients are being treated at a hospital facility for an illness, injury or medical condition. (See, e.g., *Vistica v. Presbyterian Hospital* (1967) 67 Cal.2d 465, 469 [62 Cal.Rptr. 577, 432 P.2d 193]; *Rice, supra,* 27 Cal.2d at p. 302; *Guilliams v. Hollywood Hospital* (1941) 18 Cal.2d 97, 101–104 [114 P.2d 1]; *Elam, supra,* 132 Cal.App.3d at pp. 340–341; *Valentin v. La Societe Francaise* (1946) 76 Cal.App.2d 1, 5–7 [172 P.2d 359]; 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §§ 986–988, pp. 246–249.)

### B. *Duty of a Hospital Providing Clinical Laboratory Services*

The Walkers argue that the above described duty of a hospital to exercise reasonable care to protect its patients, including the concept of a hospital's corporate responsibility as articulated in *Elam,* is broad enough to encompass a duty to directly notify and counsel Amber regarding the positive results of her cystic fibrosis screening test.[10] As noted above, the Hospital counters that its service to Amber was essentially that of a clinical laboratory and, as such, it was constrained by applicable law regulating the release of laboratory results. That is, under the circumstances, its duty was to send the results to Dr. Teel only. We believe the Hospital is correct.

■ As the trial court recognized, there are legal limitations under both federal and state law that restrict the persons to whom a laboratory may release a patient's test results. Federal regulations governing clinical laboratories provide that medical test results are to be released "*only to authorized*

---

[10] The Walkers also reference California Code of Regulations, title 22, section 70707, subdivision (b)(4), which states that a patient at a hospital has a right to informed consent and to "[r]eceive information about the illness" for which he is under the hospital's care. This section apparently relates to the situation of a patient receiving care in a hospital for treatment of an illness or injury, which is not the case here. Furthermore, as will be presently discussed, there are specific laws in place governing to whom laboratory results may be released by a clinical laboratory. Generally speaking, test results are only reported to the physician ordering the test. Here, that was Dr. Teel. The question is not whether Amber was entitled to information and counsel regarding laboratory test results, but *from whom* such matters had to be communicated. The answer, again, was Dr. Teel, Amber's physician.

*persons* and, if applicable, the individual responsible for using the test results and the laboratory that initially requested the test." (42 C.F.R. § 493.1291(f) (2010), italics added.)[11] An "[a]uthorized person" is defined as "an individual authorized under State law to order tests or receive test results, or both." (42 C.F.R. § 493.2(d) (2010), italics omitted.) Consequently, our next step is to ascertain the persons authorized under California law to order and receive laboratory test results.

■ California law clearly provides that a clinical laboratory "may accept assignments for tests only from and *make reports only to* persons licensed under the provisions of law relating to the healing arts or their representatives." (Bus. & Prof. Code, § 1288, italics added.)[12] Thus, the "authorized" persons to whom such laboratory reports may be made under California law are licensed medical professionals (e.g., the doctors or other licensees who ordered the tests). In other words, the statute establishes a standard protocol that clinical laboratory reports are made to the physician who ordered the test, not to the patient for whom the test was ultimately performed. Of course, upon receipt of the test results, the physician would then presumably inform his or her patient of any important or material results and the medical significance thereof, within the context of the existing physician-patient relationship.[13]

---

[11] A laboratory must meet certain federal standards in order to be certified to conduct diagnostic tests on human specimens (blood, tissue, and the like). These standards are embodied in the Clinical Laboratory Improvement Amendments of 1988, found primarily at section 263a of title 42 of the United States Code, and in its implementing regulations promulgated at 42 Code of Federal Regulations part 493 (2010). (*Wade Pediatrics v. Department of Health & Human Services* (10th Cir. 2009) 567 F.3d 1202, 1203.) The federal regulations cited in this paragraph are among those implementing regulations.

[12] A clinical laboratory is defined broadly to mean "any place used, or any establishment or institution organized or operated, for the performance of clinical laboratory tests or examinations or the practical application of the clinical laboratory sciences." (Bus. & Prof. Code, § 1206, subd. (a)(7).) A clinical laboratory test or examination includes "the detection, identification, measurement, evaluation, correlation, monitoring, and reporting of any particular analyte, entity, or substance within a biological specimen for the purpose of obtaining scientific data which may be used as an aid to ascertain the presence, progress, and source of a disease or physiological condition in a human being, or used as an aid in the prevention, prognosis, monitoring, or treatment of a physiological or pathological condition in a human being, or for the performance of nondiagnostic tests for assessing the health of an individual." (*Id.,* subd. (a)(4).) There is no question that a hospital's clinical laboratory would come within these broad definitions.

[13] It is within the physician-patient relationship that the doctrine of informed consent comes into play. (See, e.g., *Truman v. Thomas* (1980) 27 Cal.3d 285, 291 [165 Cal.Rptr. 308, 611 P.2d 902].) Conversely, that doctrine would not apply to a pathologist or other consultant whose role is to provide diagnostic information to a patient's physician. (*Mahannah v. Hirsch* (1987) 191 Cal.App.3d 1520, 1527–1528 [237 Cal.Rptr. 140] [pathologist sending report to referring physician had no duty to communicate his evaluations directly to patient]; 36A Cal.Jur.3d,

█ The above stated rule (regarding the reporting of laboratory results) makes sense when it is considered that the physician who ordered a medical test is likely to be the professional who can best explain the meaning and significance of the test results to the patient in the context of that patient's individual circumstances. Conversely, a requirement that a hospital laboratory or its employees send reports directly to a patient or attempt to communicate complex, problematic test results directly to a patient, independently of the patient's physician who ordered the test, would appear to pose a considerable risk of confusion or misunderstanding. In any event, whatever may be the policy judgments that stand behind the rule, the law plainly states that the persons to whom clinical laboratories may provide laboratory reports are limited to authorized persons, which in this case means the physician or other licensed practitioner ordering the test. (Bus. & Prof. Code, § 1288.)

Consistent with this limitation, Health and Safety Code section 123148 underscores that in the ordinary course, a patient's point of contact or source of information for receiving a laboratory report is his or her doctor or other health care professional who ordered the test. That section states in relevant part as follows: "[A] health care professional at whose request a test is performed shall provide or arrange for the provision of the results of a clinical laboratory test to the patient who is the subject of the test if so requested by the patient, in oral or written form." (Health & Saf. Code, § 123148, subd. (a).)

█ We conclude from the above provisions of law that to the extent the Hospital was providing clinical laboratory services to carry out a test ordered by Dr. Teel's office, it owed a duty of care to send the laboratory results to Dr. Teel *only*, because the law limited the authorized persons to whom the results may be sent. (Bus. & Prof. Code, § 1288.) That is, the Hospital had no affirmative duty to release the laboratory results directly to Amber or to counsel her regarding the same. Rather, the Hospital satisfied its duty of care by promptly and accurately transmitting the laboratory results to Amber's physician, Dr. Teel.

█ An additional factor we cannot ignore is that when a laboratory test is ordered by a patient's physician, there is an existing patient-physician relationship with respect to the subject matter of the laboratory test. Hence, a direct disclosure of laboratory results to the patient might unwisely interfere in that relationship. We do not believe that the Hospital, in providing clinical laboratory services on a test ordered by Dr. Teel's office, was obligated to interpose itself between the physician and his patient by independently disclosing the laboratory results directly to Amber. (See, e.g., *Derrick v.*

---

*supra*, Healing Arts & Institutions, § 385, p. 70.) Here, the role of the Hospital laboratory was analogous to that of a consultant, since the laboratory results had to be sent only to Dr. Teel.

*Ontario Community Hospital* (1975) 47 Cal.App.3d 145, 154 [120 Cal.Rptr. 566] (*Derrick*) [hospital did not owe a duty to warn patient that she contracted a contagious disease when the patient had an attending physician who had undertaken to treat and advise her].)[14] In *Derrick*, the Court of Appeal explained one of the reasons that the physician, *not* the hospital, had the duty to disclose: "We do not think it wise to impose upon Hospital the duty to advise a patient or a patient's parents concerning the patient's condition when that duty might substantially interfere with the relationship between the patient and her attending physician." (*Derrick, supra*, at p. 154, fn. omitted; see also *Mahannah v. Hirsch, supra*, 191 Cal.App.3d at pp. 1527–1528 ["To impose a duty on a consulting pathologist to communicate with the patient regarding his evaluations would create an undue burden on the pathologist and could also be disruptive of the primary physician's relation with his patients."].) The same considerations apply in the instant case. More importantly, we do not see how we could appropriately impose the duty asserted by the Walkers in light of the fact that the law indicates that laboratory results are to be reported *only* to an authorized person, which in this case was the physician who ordered the test.

■■■ The Walkers' arguments in favor of such a duty are to no avail. Whatever may be the scope of a hospital's duty under *other* circumstances, we must focus our inquiry on the particular facts before us.[15] " ' "The extent and character of the care that a hospital owes its patients depends on the circumstances of each particular case." ' " (*Rice, supra*, 27 Cal.2d at p. 299.) We agree with the Hospital that "[p]erforming a single discrete outpatient lab test . . . does not invoke the full panoply of hospital duties regarding every aspect of the patient's health care treatment," nor have the Walkers presented any case to support such a view.[16] Amber simply made use of the Hospital's clinical laboratory services for a test ordered by her personal physician's office. In that situation, the Hospital was obliged to follow laws limiting the persons to whom such results could ordinarily be disclosed.[17] We conclude the trial court correctly resolved this issue of duty in the Hospital's favor.

[14] However, *Derrick* found that the hospital in that case did owe a *statutory* duty to inform health officials of the patient's contagious disease. (*Derrick, supra*, 47 Cal.App.3d at p. 152.)

[15] We offer no opinion on what the scope of a hospital's duty would be under other circumstances. None of the cases cited by the Walkers involved circumstances or issues close to those presented here.

[16] Although the outcome of the issue of duty is arguably simpler in the outpatient setting of this case, we are not basing our opinion on the distinction between outpatient and inpatient status of the hospital patient, but on the operative law regarding the persons to whom laboratory results are reported. Also, we note that even in a typical inpatient situation, laboratory reports are still made to the attending physician, not directly to the patient. (See *Mahannah v. Hirsch, supra*, 191 Cal.App.3d at p. 1527, fn. 2.)

[17] Because the question of duty before us is clearly answered by the relevant statutes and regulatory provisions, we need not consider the Walkers' arguments based on general observations in the *Elam* case about the evolving and multifaceted nature of a modern hospital. (See

Consistent with the above discussion of a clinical laboratory's limited duty of disclosure, the Hospital's motion for summary judgment presented the declaration of its medical expert, Richard Garcia-Kennedy, M.D. Dr. Garcia-Kennedy was a licensed medical doctor, a practicing associate pathologist in a hospital clinical laboratory setting and was, at the time of trial, the medical director of the clinical laboratories at the California Pacific Medical Center in San Francisco, California. Dr. Garcia-Kennedy acknowledged the federal and state laws that we have referred to above concerning clinical laboratories. He offered the following expert opinion while he also summarized the applicable standard of care: "[I]t is my opinion that [the Hospital's] Clinical Laboratories, by and through the services provided to Amber . . . met the standard of care in its treatment of Amber . . . . The reporting of lab results, by the clinical laboratory, directly to a patient in Amber['s] circumstances, is not an accepted practice of the clinical laboratory profession. The reporting of lab results must only be directed to the physician or health care provider who ordered the testing. Except in situations where a patient makes a written medical records request through the Medical Records Department within a hospital, it is not the standard of care in the clinical laboratory profession to be the entity or individual to disclose Cystic Fibrosis mutation screening lab results directly to patients. . . . Instead, the standard of care in the clinical laboratory profession is to disclose lab results directly to the physician who ordered the laboratory testing for the patient and permit him/her to provide any necessary explanations, recommendations or warnings." We believe Dr. Garcia-Kennedy's testimony accurately restated and applied the relevant duty of care for the reporting of laboratory results in this case, which duty, as discussed at length above, was directly regulated by federal and state law.[18]

## C.  *The Hospital's Supporting Evidence*

Having concluded our analysis of duty, we now confirm that the Hospital's motion adequately supported its position as to the material undisputed facts. In support of its contention that the element of duty of care could not be established, the Hospital's moving papers presented evidence showing that Amber went to the Hospital's clinical laboratory to undertake a cystic fibrosis screening test that was ordered by Dr. Teel's office. That is, the Hospital laboratory performed or facilitated a diagnostic test ordered by Amber's personal physician. It took a blood specimen and sent it to the ARUP laboratory for processing of the cystic fibrosis screening. When the Hospital laboratory received the results of the testing done by the outside laboratory, it

---

*Elam, supra,* 132 Cal.App.3d at pp. 344–345.) In any event, under the facts of this case, it is clear that the Hospital was acting as a clinical laboratory, not in a broader capacity.

[18] Dr. Garcia-Kennedy also noted the following rationale: "Not only is it professionally irresponsible for clinical laboratory non-physician staff to communicate various diagnoses to patients given their lack of medical training, it is also an interference with the treating physician's management of the care and treatment of his/her patient."

forwarded those results to Dr. Teel only. The legal setting of these facts, as pointed out in the Hospital's motion, included the laws which limited the persons to whom a clinical laboratory would be authorized to report laboratory results. It appears from this evidentiary showing that the Hospital met its burden as the moving party of presenting prima facie evidence negating the element of duty to disclose the laboratory report to Amber. The burden shifted to the Walkers to present facts sufficient to create a triable issue of material fact. (§ 437c, subd. (p)(2).)

### D. *The Walkers Failed to Show a Triable Issue of Material Fact Regarding Duty*

In response to the motion, the Walkers did not meet their burden of showing the existence of a triable issue of material fact on this issue of duty. First, the Walkers pointed out that in situations where a patient makes a special request to receive laboratory results, the Hospital will provide the results directly to that patient. While that may be true in the abstract, it is irrelevant here because Amber admitted that she never made such a records request concerning the cystic fibrosis test. Second, the Walkers argued based on the declaration of their own medical expert that there was a broader duty of care on the part of the Hospital. That expert, James Tappan, M.D., stated his opinion that the Hospital did have a duty to directly inform and counsel Amber of the laboratory results. However, the trial court properly sustained objections to that portion of Dr. Tappan's declaration on several grounds, including that the issue of duty in this case depended on the trial court's interpretation and application of federal and state law. Since the trial court's construction of those laws effectively resolved the duty issue in the Hospital's favor, the contrary opinion of Dr. Tappan became irrelevant. (See *Asplund v. Selected Investments in Financial Equities, Inc.* (2000) 86 Cal.App.4th 26, 50 [103 Cal.Rptr.2d 34].) Third, Amber's desire to have her baby at the Hospital because it was a full-service birthing center, and the prior occasions that she had used the Hospital's services did not somehow expand the nature of her visit on the occasion in question. We conclude the Walkers failed to demonstrate the existence of a triable issue of material fact, and therefore the trial court correctly concluded that the alleged duty (to directly disclose the results to Amber) was negated.[19]

---

[19] Our conclusion that there was no duty on the part of the Hospital to directly disclose laboratory results to Amber comports with the policy that it is physicians or other licensed medical practitioners, not hospitals as corporate entities, who actually practice medicine. (Bus. & Prof. Code, §§ 2032, 2400; *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501 [61 Cal.Rptr.3d 754]; *Conrad v. Medical Bd. of California* (1996) 48 Cal.App.4th 1038, 1042–1043 [55 Cal.Rptr.2d 901].) That includes such medical practices as interpretation of laboratory results and provision of advice and counsel to a patient regarding the same.

## IV. *The Hospital Had No Duty to Invoke Policies and Procedures Regarding Test Results*

As we have seen, the Hospital's duty of care was to faithfully and promptly transmit the laboratory test results to the patient's personal physician, Dr. Teel. Indeed, under restrictions imposed by California and federal law, Dr. Teel, as the physician who ordered the test, was the only authorized person to whom the Hospital laboratory could, in the ordinary course of things, report the results.[20]

The Walkers alleged that in addition to a duty to directly inform and counsel Amber, the Hospital *also* had a duty to invoke policies and procedures to *ensure* that she would be informed and counseled concerning the test results. No specifics were provided in the complaint as to what policies or procedures would supposedly have accomplished that result, and the Walkers' appeal does not supply that information.[21] But aside from the sheer vagueness of the allegations, we would decline to impose such a duty for several reasons. First, it appears the asserted duty is, in essence, a mere adjunct of the alleged duty to disclose the results to Amber—a duty we have rejected in this case.[22] Since the Hospital did not have a duty to directly disclose the results to Amber, it likewise did not have a duty to invoke unspecified policies to *ensure* such a disclosure apart from its prompt and accurate transmittal of the results to Amber's physician. Second, by putting the results into the hands of Amber's personal physician, the Hospital arguably took the single most effective measure toward achieving the desired result of having Amber receive information and counseling regarding the laboratory test; yet for the Hospital to intercede beyond that in order to *ensure* counseling as to the test results would likely involve an interference in the physician-patient relationship. (See, e.g., *Derrick, supra*, 47 Cal.App.3d at p. 154 [describing such an interference as unwise].) Third, there is a further burden that would result from imposing the asserted duty. We fail to see how implementation of policies or procedures designed to *ensure* that disclosure and counseling always takes place in such cases could realistically be limited to cystic fibrosis test results. Since other patients undergoing *other* doctor-ordered laboratory tests (whether genetic or not) could reasonably insist that their

[20] The parties both acknowledge the Hospital has procedures by which patients may specially request laboratory test results. That was not the case here.

[21] We note the Walkers' expert, Dr. Tappan, opined there is such a duty, but the assertion was stated as a conclusion without an adequate factual foundation to support it. We agree with the trial court's ruling sustaining the Hospital's objections to this portion of Dr. Tappan's opinion.

[22] Although the Hospital's motion did not expressly refer to this aspect of the duty issue, we believe it was reasonably subsumed within its discussion of duty to disclose. Therefore, we reject the Walkers' contention that the Hospital did not meet its initial burden (as the moving party) on this aspect of the alleged duty.

own test results were also medically important, it is predictable that considerations of potential liability would force hospital laboratories to do the same (i.e., follow the same policy) for many or all patients for whom laboratory services were provided, or avoid providing such services altogether. Thus, the asserted duty would appear on its face to create an onerous administrative burden on hospitals providing laboratory services and, on the record before us, we decline to impose that burden. (*Rowland v. Christian, supra,* 69 Cal.2d at p. 113 [factor of burden and consequences of imposing duty].) For all of these reasons, we conclude there was no duty in this case for the Hospital to implement the unspecified policies and procedures.

V., VI.\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment of the trial court is affirmed. Costs on appeal are awarded to the Hospital.

Gomes, Acting P. J., and Dawson, J., concurred.

---

\*See footnote, *ante,* page 948.